RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0023p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

VIRGINIA S. CAUDILL,

        *Petitioner-Appellant*,

    *v.*

JANET CONOVER, Warden,

        *Respondent-Appellee.*

No. 14-5418

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:10-cv-00084—Danny C. Reeves, District Judge.

Argued: November 29, 2017

Decided and Filed: February 2, 2018

Before: MOORE, SUTTON, and KETHLEDGE, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Dennis J. Burke, DEPARTMENT OF PUBLIC ADVOCACY, LaGrange, Kentucky, for Appellant. Matthew R. Krygiel, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Dennis J. Burke, Euva Blandford, Krista A. Dolan, DEPARTMENT OF PUBLIC ADVOCACY, LaGrange, Kentucky, for Appellant. Matthew R. Krygiel, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.

    SUTTON, J., delivered the opinion of the court in which KETHLEDGE, J., joined, and MOORE, J., joined in part. MOORE, J. (pp. 15–38), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

SUTTON, Circuit Judge.   Virginia Caudill and Jonathon Goforth broke into Lonetta White's home and beat her to death with a hammer when she refused to give them money to buy drugs.  After ransacking her home for valuables, they wrapped her body in a carpet and loaded it in the trunk of her own car.  They drove the car to an empty field, doused it with gasoline, and set it on fire.  An autopsy revealed that she died from massive head injuries, including blows that caved in parts of her skull.

A Kentucky jury convicted Caudill and Goforth in a joint trial of murder, robbery, burglary, arson, and tampering with evidence.  After a mitigation hearing, the same jury sentenced them to die for their crimes.  The Kentucky Supreme Court affirmed Caudill's convictions and sentence and rejected her requests for collateral relief.  *Caudill v. Commonwealth*, 120 S.W.3d 635 (Ky. 2003); *Caudill v. Commonwealth*, No. 2006-SC-000457, 2009 WL 1110398 (Ky. Apr. 23, 2009).  Caudill filed a federal petition for a writ of habeas corpus, which the district court denied.  *Caudill v. Conover*, No. 5:10-84, 2014 WL 349300 (E.D. Ky. Jan. 31, 2014).

We granted a certificate of appealability to consider two questions:  (1) whether the state courts reasonably rejected her *Batson* claim, and (2) whether her lawyers provided ineffective assistance by choosing not to call additional witnesses during the penalty phase.  Neither claim has merit, and accordingly we must affirm.

I.

*Batson v. Kentucky*, 476 U.S. 79 (1986), sets forth a three-step process for assessing whether a peremptory challenge violates the Equal Protection Clause of the Fourteenth Amendment.  Step one:  the defendant must make a prima facie showing of discrimination.  Step two:  the prosecutor must offer a nondiscriminatory reason for the strike.  Step three:  the trial court must "determine if the defendant has established purposeful discrimination."  *Id.* at 96–98.

Caudill's lawyer raised a *Batson* challenge toward the end of the state court's jury selection. Here is the key exchange:

> [DEFENSE COUNSEL]:  I guess we would have a motion evaluating, uh, I believe there were nine strikes for the Commonwealth.  They struck eight males.  I believe that, uh, there's uh—shows a clear bias against, uh, uh, men in this case, possibly because of the woman on trial here.  And I just feel that, uh, it rises to the same level as a *Batson* issue—
> [PROSECUTOR]:  Are you saying men are a protected class?  Is that what you're saying?
> [DEFENSE COUNSEL]:  Yes.
> [THE COURT]:  White males?
> [DEFENSE COUNSEL]:  Well, I don't know if they're—
> [PROSECUTOR]:  That's news to the rest of us.
> [DEFENSE COUNSEL]:  Well, we would just—
> [THE COURT]:  Never had men.  The only people excluded were white males.
> [DEFENSE COUNSEL]:  Look, well, we just for the record make that motion.
> [THE COURT]:  I understand.

DVD A-4 at 09:12:33–09:13:23.

In response, the prosecutor gave the following reasons for striking the eight potential jurors.  Robert Feezor opposed the death penalty.  Nicholas Edwards had only a grade school education and did not "underst[an]d what was going on."  Shannon Patterson had relatives in prison and serious hesitations about the death penalty.  James Franke seemed "uncomfortable" with the death penalty and came off as "a little strange."  Robert Biene hated the police and the judicial system.  Robert Keston did not like the death penalty and was "practically a blood brother" of Caudill's lawyer.  Gary Lloyd said that he would impose the death penalty only in rare circumstances.  And the prosecution doubted that they could persuade William Case of the defendants' guilt or persuade him to impose the death penalty.  *Id.* at 09:13:23–09:16:54.

After listening to these explanations, the trial court found no discrimination afoot.  "[I]f the appellate courts for whatever magical reason perceive white males to be a protected class, I think these are nondiscriminatory reasons that would allow them to be struck."  *Id.* at 09:16:54–09:17:15.  The defense neither objected to the substance of the court's ruling nor asked for an

opportunity to show that the prosecutor's explanations did not add up or otherwise amounted to a smokescreen for discrimination.

On direct appeal, the Kentucky Supreme Court held that "[t]he trial judge found all of [the prosecutor's] reasons to be race-neutral and we are unable to conclude that his finding in that regard was clearly erroneous." *Caudill*, 120 S.W.3d at 657.

The parties agree that the Kentucky Supreme Court decided Caudill's *Batson* claim on the merits. And so do we. That means we may grant Caudill's petition only if the state court's rejection of this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

In trying to meet this standard, Caudill focuses on the trial court's handling of *Batson*'s third step. At that stage, she points out, *Batson* requires courts to undertake "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," 476 U.S. at 93, and the trial court's explanation, she elaborates, was neither sensitive nor careful, as it took less than three seconds and gave defense counsel little, if any, chance to respond. Although the trial court did not use a model method for resolving the *Batson* claim, Caudill's argument nonetheless fails.

We need not decide whether the U.S. Supreme Court has "clearly established" that *Batson* applies in this setting. Either way, Caudill's claim fails because she makes too much of the "sensitive" inquiry language in *Batson*, at least in the context of a habeas claim. The Supreme Court has never directed trial courts to make detailed findings or to solicit the defense attorney's views before ruling on a *Batson* motion. *Batson* itself "decline[d] . . . to formulate particular procedures to be followed" beyond the three-step framework. 476 U.S. at 99. On reflection, that is not surprising. Some *Batson* claims will be stronger than others. And some claims thus will deserve more process or more consideration or more argument than others. The amount of such deliberation will invariably turn on the circumstances of each case. *Id.* at 97. The more flexible a standard, as this one surely is, the more difficult it will be to show an unreasonable violation of it. *Yarborough v. Alvarado*, 541 U.S. 653, 664 (2004).

The Kentucky Supreme Court did not unreasonably apply *Batson* here. Jury selection lasted several days. The state court judge was there the entire time. He had ample opportunity to observe the demeanor of the jurors and hear their answers. He listened to the prosecutor's questions during *voir dire* and watched the strikes. By the time he entertained Caudill's *Batson* challenge, he had plenty to go on in deciding how to respond. He also had the prosecutor's race-neutral explanations to consider. It thus is inaccurate, and unfair to the state judge, to say that he thought about the *Batson* claim for just "three seconds." Appellant's Br. 25. He had ample time to think about and to gauge this claim throughout this process. Yes, the state court would have done well (and would have done better) to explain more fully why the prosecutor's explanations convinced him that no discrimination of any sort was at play. But his ruling did not violate any clearly established law.

Caudill insists that the nature of some of the prosecutor's explanations made it impossible for the trial court to evaluate the prosecutor's credibility so quickly. She points out that the prosecutor struck Edwards because he had a "grade school education." Appellant's Br. 27. Because Edwards never discussed his education at *voir dire*, the only way for the trial judge to confirm that explanation was to look at Edwards' juror questionnaire. That he didn't do so, she says, suggests that he abdicated his duties under step three of the *Batson* inquiry.

But the prosecutor struck Edwards for another reason too: The potential juror did not "underst[an]d what was going on." The judge could have credited that explanation. And reasonably so: Edwards initially told the prosecutor that he could impose the death penalty. Then, when questioned by defense counsel, he claimed to be against it. Then, when the prosecutor on redirect noted his inconsistent answers, Edwards responded incoherently. After the prosecutor asked him to describe circumstances that would warrant the death penalty, Edwards responded: "Um, it means just like whatever the crime is, I mean, you know. Like if it's a—I don't know. I can't explain." R. 47-3 at 14. Through it all, the prosecutor and the judge at any rate were right: Caudill concedes that Edwards indeed had just a grade-school education. Oral Arg. Tr. 19:20–19:29.

Caudill adds that the prosecutor exaggerated in explaining why he struck Keston and Lloyd. She notes that Keston was not actually a "blood brother" of one of Caudill's attorneys.

Appellant's Br. 30.  And Lloyd never said that he would "very rarely" impose the death penalty. *Id.* at 31.  The judge's failure to catch these overstatements shows that he failed to conduct a proper *Batson* inquiry, she claims.

But that is an overstatement of its own.  The prosecutor gave a second reason for striking Keston, namely that he generally did not approve of the death penalty.  That's what Keston said at *voir dire*: "in most circumstances . . . I wouldn't support [the death penalty]."  R. 47-2 at 33. True enough, Lloyd never said he would "very rarely" impose the death penalty.  But he did say that he "d[idn't] know" how he felt about the death penalty, that it would be "more difficult" for him to impose it, and that he was concerned about "people on death row who had been found innocent of the crime they were there for."  R. 47-3 at 5–6.  The prosecutor's failure to recall Lloyd's exact words does not show that the substance of his objection was false.

The trial court, to repeat, would have done well to say more in explaining why the prosecutor's strikes were not discriminatory.  But the Supreme Court has never clearly established a more rigorous procedure at this stage of the *Batson* inquiry.  And the Kentucky Supreme Court did not unreasonably apply what the Supreme Court has required in concluding that the trial court complied with *Batson*.  The district court correctly rejected this claim.

## II.

Caudill claims that her lawyers provided ineffective assistance at the penalty stage of her trial by failing to interview and call more witnesses.  To prevail on this claim, Caudill must do two things.  She must establish a Sixth (and Fourteenth) Amendment violation—that her lawyers performed well below the norm of competence in the profession and that this failing prejudiced her case.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  And she must satisfy AEDPA— by showing that any rulings by the state courts on the merits of this claim were unreasonable. 28 U.S.C. § 2254(d).

## A.

Caudill's lawyer called seven witnesses at the penalty phase, including her mother, her only brother, her only sister, and her daughter.  The jury learned from them that Caudill's father

was an alcoholic who physically and emotionally abused the family. R. 47-10 at 37 (testimony of mother); *id.* at 47 (brother); *id.* at 50 (sister). They learned that Caudill and her siblings were "scared to death" of their father and would sometimes hide at their grandparents' house. *Id.* at 37 (mother). They heard that Caudill was bullied because of her weight, *id.* at 38 (mother); *id.* at 50 (sister), and that Caudill had serious problems with drug and alcohol addiction, *id.* at 38–39 (mother); *id.* at 46 (brother); *id.* at 52 (sister); *id.* at 54 (daughter). And they heard that, when Caudill was sober, she was "loving and kind," *id.* at 47 (brother), "the most wonderful daughter," *id.* at 39, and a "great" mother, *id.* at 54. Some witnesses broke down in tears as they testified, and above all they conveyed the toll that physical abuse and substance abuse had taken on Caudill and the impact they had had on her conduct. *Id.* at 47–48.

Dr. Peter Schilling, a psychologist, provided the most detailed testimony. The emotional and physical abuse Caudill suffered as a child at the hands of her father, he explained, distorted the way she interacted with men. *Id.* at 95. She sought out "abusive, dominating-type" men and had a submissive personality. *Id.*

As evidence, Dr. Schilling provided the jury with detailed information about Caudill's past relationships. Caudill married her first husband when she was just a teenager, and she was so submissive that she "allowed the man to lead her out of the state." *Id.* at 96. That marriage ended when the man threatened to kill her. *Id.*

None of her other relationships fared much better. Dr. Schilling testified that Caudill had been "hit in the face by men . . . more times than she c[ould] remember." *Id.* at 97. Her second husband once "took a pipe and busted out the window of her . . . vehicle." *Id.* at 96. Thomas Garrett, one of her boyfriends, "broke her wrist, nose and jaw at various times," "repeatedly struck her face," and was "so dysfunctional" that he eventually killed himself. *Id.* at 97. Another boyfriend knocked her out cold. *Id.* At one point, a businessman coaxed Caudill into having sex with clients in exchange for money and access to a condo. *Id.* at 97–98.

What is more, personality tests confirmed that Caudill was "about as submissive as you can get." *Id.* at 107. Other tests suggested that Caudill had a learning disability, extensive brain damage from head trauma and drug abuse, or all of the above. *Id.* at 101–02. And while Caudill

had a normal IQ and scored in the "gifted" and "genius" ranges in some areas, she scored well below average in other measures of intelligence. *Id.* at 100–01.

All of this testimony showed two things: that Caudill was a different person when alcohol and drugs took over, and that her traumatic experiences with her father made her susceptible to manipulation by men. The first theme implicated one theory for leniency: Why impose the death penalty on Caudill when she is fundamentally a good person whose family loves her and who merely needs to escape the lure of addiction? The second theme implicated another theory for leniency: Why impose the death penalty on Caudill when a cruel and malicious father made her susceptible to being duped into foolish behavior by a string of men, ending with Goforth?

Caudill faults her lawyers for failing to do more, noting that this testimony was "nonspecific" and "generic." Reply Br. 10–11. Had her lawyer been more diligent, she adds, he would have discovered other witnesses who could have painted a "more vivid picture." *Id.* at 18. Here are the other witnesses and here is what they would have said in abridged form:

- Ruth Brown, Caudill's neighbor, would have testified that she witnessed Caudill's father chasing her mother down the railroad tracks and shooting at her with a rifle.
- Vina Caudill, Caudill's grandmother, would have testified that she feared for the lives of her daughter-in-law and her grandchildren.
- Barbara Watson, Caudill's second cousin, witnessed Caudill's father threaten her mother.
- Ray Towery, one of Caudill's friends, would have testified about Caudill's relationship with a former boyfriend, Eddie Stallworth. Towery saw Stallworth physically abuse her and encourage her "to begin prostituting." At one point, Towery had to intervene to stop Stallworth from beating Caudill. RCr 11.42 App. at 608–10.
- Mike Sipple, a former boyfriend, would have testified that "Virginia is dependent on men" and addicted to drugs. *Id.* at 612.
- Ray Hopkins, another former boyfriend, would have testified that he physically abused Caudill. At one point, he notes, he "backhanded Virginia so hard that she became unconscious." *Id.* at 615. He also would have told the jury that Caudill called the police several times out of fear.
- Billie Davenport, a social worker, would have testified that Hopkins abused Caudill and threatened to kill her with a knife.

On top of these lay witnesses, Caudill says that her lawyer should have called Dr. Allen, a second expert witness. He would have testified that Virginia had "probable cerebral brain damage" from years of heavy drug abuse and head trauma. *Id.* 681.

The Kentucky Supreme Court held that Caudill's lawyers did not violate the Sixth (and Fourteenth) Amendment by failing to call these additional witnesses. It reasoned that the existing witnesses adequately presented this information and these mitigation themes. In its view, "[d]efense counsel's investigation and presentation of mitigation evidence in this case revealed Caudill's abusive childhood, her substance abuse issues, her violent relationships with males, and her cognitive deficiencies." *Caudill*, 2009 WL 1110398 at *5. "That additional witnesses existed who would have corroborated or expanded upon this testimony," the court concluded, "does not amount to deficient performance by counsel." *Id.*

B.

*Deficiency.* The state court resolved the deficiency prong of Caudill's ineffectiveness claim on the merits. That means we must deny Caudill's petition unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Caudill maintains that the state court's decision involved an unreasonable application of law. But a state court's decision on the deficiency prong satisfies that requirement only if there is no reasonable argument that counsel met *Strickland*'s deferential standard. *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Caudill cannot meet that imposing standard.

Start with the proposed testimony of other relatives and friends. "[T]here comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) (per curiam). Just so here. Having already discovered evidence of Caudill's abusive childhood, substance abuse problems, and abusive relationships with men, her lawyer had no constitutional obligation to identify and interview distant relatives, former childhood neighbors, past boyfriends, and acquaintances who would provide similar information. It was reasonable

for her lawyer to assume that those closest to Caudill—her immediate family—would have the most detailed information about her life, and would provide the most compelling testimony as a result. That's particularly so given the reality that her family still cared for her and loved her. Only alcohol and drugs, particularly crack cocaine, had an estranging effect on the family. When under the influence drugs or alcohol, Caudill was one type of person. When not, she was another. It's difficult to maintain that more distant relatives and other friends could have conveyed this theme more powerfully than her own mother, her two siblings, and her daughter.

So too was it reasonable for Caudill's lawyer to rely on Dr. Schilling, rather than her former boyfriends, to convey the abuse she suffered at their hands. Only Dr. Schilling could connect the dots about how Caudill's abusive childhood led to her submissive personality, which led to her tendency to associate with violent and controlling men like Goforth. No lay witness could have conveyed this theory as persuasively. Nor was there reason at the time to think her former boyfriends would provide useful testimony. After all, her former boyfriends "'would have had no particular reason to be favorably predisposed toward' admitting their own abuse." *See infra* at 35 (quoting *Skipper v. South Carolina*, 476 U.S. 1, 8 (1986)). With Dr. Schilling's testimony in hand, it was reasonable to devote resources in more promising directions.

*Van Hook* illustrates the point. Van Hook's lawyer presented evidence of Van Hook's traumatic childhood, substance abuse, and personality disorder. *Van Hook*, 558 U.S. at 10–11. But he failed to interview other family members who "could have helped his counsel narrate the true story of Van Hook's childhood experience." *Id.* at 11. The Court held (under fresh review no less) that there was nothing wrong with the lawyer's decision not to seek more mitigation evidence about the defendant's background than he already had. *Id.* at 11–12. Having already unearthed evidence "from those closest to Van Hook's upbringing and the experts who reviewed his history," the lawyer was under no duty to "identify and interview every other living family member or every therapist." *Id.* at 11. The same conclusion applies here—and doubly so because AEDPA deference applies.

Nor was her lawyer incompetent for failing to call a second expert, Dr. Allen. In truth, Dr. Allen's testimony had the potential to do more harm than good. Dr. Allen's report said that Caudill denied that her father abused her or her siblings. This contradicted a key (and, it seems

to us, powerful) theme of her mitigation case.  Because Dr. Schilling had already testified about Caudill's brain damage, her lawyer reasonably could conclude that calling Dr. Allen wasn't worth the risk of undermining this other mitigation testimony.  We presume the reasonableness of such strategic decisions.  *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011).

Caudill claims several cases lead to a different conclusion.  None helps.  Most of the cases involve counsel's failure to interview *anyone*.  *See, e.g.*, *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam); *Wiggins v. Smith*, 539 U.S. 510, 525 (2003); *Foust v. Houk*, 655 F.3d 524, 536 (6th Cir. 2011).  That situation presents a difference in kind, as a complete failure to investigate is different from failing to "dig deeper." *Foust*, 655 F.3d at 536.  Neither is this case like *Rompilla v. Beard*, 545 U.S. 374 (2005), in which the lawyers failed their client because they did not discover mitigating evidence in Rompilla's criminal records even though the State notified them that it intended to seek the death penalty by proving that Rompilla had a long history of felony convictions.  *Id.* at 383–84.

Caudill points out that the Kentucky Supreme Court incorrectly said that Caudill's mother, brother, and sister all gave details of Caudill's history with abusive men.  That was a mistake, true enough.  But it was a stray one.  And the misstatement had little import given the other evidence on this score and the court's other explanations for its decision.  That presumably explains why Caudill does not argue that the court's decision was "based on an unreasonable determination of the facts."  28 U.S.C. § 2254(d)(2).  All in all, the state court did not unreasonably apply *Strickland*'s deficiency prong.

*Prejudice.*  Even if Caudill could show that her trial lawyers were unconstitutionally incompetent, she also must demonstrate that "there is a reasonable probability" that, but for that incompetence, "the result" of the mitigation hearing "would have been different." *Strickland*, 466 U.S. at 694.  We give fresh review to this part of her claim because the Kentucky Supreme Court did not address it.

To show prejudice, Caudill must point to evidence that "differ[s] in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005).  That did not happen.  Towery, Hopkins, and

Davenport, all proposed new witnesses, would have testified about the abuse Caudill suffered at the hands of her boyfriends. But Dr. Schilling testified extensively about that kind of abuse. Sipple, another proposed new witness, would have said that Caudill was submissive and dependent on men. But Dr. Schilling had something better: personality tests showing the same thing. Brown, Watson, and Caudill's grandmother, still more new witnesses, would have told stories about Caudill's father. But those stories merely elaborate on testimony given by Caudill's mother, brother, and sister.

In considering the potential prejudice of omitting this additional testimony, it's important to keep in mind the State's evidence on the other side of the scale. *Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam). Caudill and Goforth were undoubtedly guilty. When the police tried to question the pair, they fled. When police caught the pair, they confessed. Both admitted that they were present during the murder—but neither admitted who put the hammer to White's skull—and the undisputed evidence showed that both defendants disposed of the body by wrapping it in a carpet, putting it in a car, and burning the car.

Considerable evidence, moreover, suggested that Caudill, not Goforth, was the mastermind. Caudill dated White's son, and White gave Caudill money many times before. Jeanette Holden testified that, shortly before the murder, Caudill mentioned that she knew how to get "some money" to buy drugs and asked her if she was "down for hurting somebody." R. 47-7 at 25–26. Julia Davis and Cynthia Ellis, two jailhouse informants, told the jury that Caudill confessed to being the killer. And Davis indicated that Caudill felt little remorse for her actions and, ruthlessly to the contrary, found them funny. "Help me, help me, why are you doing this to me?" she would frequently say while imitating White—a 73 year-old woman who had supported her and given her money before—as she lay dying from her wounds. *Id.* at 255.

For what it is worth, the record in front of the state court confirms that at least some jurors thought that Caudill was the aggressor rather than the dupe. An alternate juror who sat during the guilt phase of the trial stated in a post-verdict interview that he "believed much of what Goforth said on the stand to pin the murder on Caudill"—that Caudill "exploded" when White refused to "give her money" to buy drugs. RCr 11.42 App. at 712. Another juror who sat during both the guilt and penalty phases stated that she thought "Caudill [was] more culpable"

and that "Caudill hit the victim first and then passed the hammer to her co-defendant." *Id.* at 706.

All evidence considered, the proposed new witnesses had no realistic possibility of changing the verdict. At bottom, Caudill and Goforth murdered Lonetta White for drug money. Instead of facing the consequences of their actions, they torched her body to eliminate evidence and went on the run. And instead of showing remorse for her deeds, Caudill ridiculed the way in which White begged for mercy. The jury did not sentence Caudill to die because her lawyers were incompetent. They did so because of her actions.

Caudill and the dissent resist this conclusion on the ground that the evidence her lawyer failed to find was stronger than the evidence he found. The jury merely heard, they insist, that Caudill's father "drank a lot" and "[w]hen he drank he was 'mean.'" Appellant's Br. 61–62; *infra* at 29. But that understates things. The jury heard from Caudill's mother that Caudill's father was much more than a mean drunk; he "was abusive to me, he was abusive to the children, and he was physically and mentally abusive," she said. R. 47-10 at 36. They heard similar testimony from Caudill's brother, her sister, and Dr. Schilling. And the jurors didn't just hear that the children were "scared" of their father. *Infra* at 17–18. They heard that the children were "scared to death" of him, so much so that they would hide or run away when he came home drunk. R. 47-10 at 36–37.

Some of the witnesses, to be sure, might have painted an even more detailed picture of the abuse Caudill suffered. But this argument is of a piece with the one rejected in *Van Hook*. There, a panel of this court held that Van Hook was prejudiced by his lawyer's failure to seek out "available family members willing to help tell his story" through "first-hand accounts," including a story about how "his father tr[ied] to kill his mother." *Van Hook v. Anderson*, 560 F.3d 523, 529 (6th Cir. 2009). But the Supreme Court turned that argument aside because the trial court was "already aware that [Van Hook's] father had a violent nature." 558 U.S. at 12. We should not make the same mistake twice.

That leaves one loose end. In addition to faulting her lawyer for failing to call more witnesses, Caudill accuses him of failing to prepare the witnesses who testified. But she never

asked us to grant a certificate of appealability on that claim. A.R. 10 at 40–54. We may not consider it now. *See Hill*, 400 F.3d at 332.

For these reasons, we affirm.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part. Although I agree with the majority's conclusion with regard to Virginia Caudill's *Batson* claim, I disagree with the majority's conclusion that Caudill has failed to establish constitutional deficiency and prejudice with regard to her ineffective-assistance-of-counsel claim. Because the efficacy of counsel's assistance is a fact-mired question, I first offer a more detailed summary of the facts at issue.

## I. BACKGROUND

### A. Caudill's Mitigation Case

Caudill was jointly tried with co-defendant Johnathon[1] Wayne Goforth. Although both "admitted they were present at the commission of all of these crimes," each "accused the other of murdering and robbing the victim and of setting fire to the automobile." *Caudill v. Commonwealth* (*Caudill I*), 120 S.W.3d 635, 648 (Ky. 2003).[2] The jury never settled on either of these competing narratives: at the conclusion of the trial's guilt phase, both Caudill and Goforth were convicted of "murder—principal or accomplice." *Id.* at 666.

During the trial's sentencing phase, Caudill's counsel called six lay witnesses: Caudill's mother, Mary Caudill; brother, Craig Caudill; sister, Rhonda Caudill Whitt; daughter, Leslie Nicole Caudill; prison minister, Caroline Worley; and cousin, John Moncrief. *See* R. 47-10 (Trial Tr., Index to Videotape #9 at 2–3, Videotape #9 at 33, 45, 49, 52, 56) (Page ID #2021–22, 2052, 2064, 2068, 2071, 2075). Caudill's trial counsel also called one expert witness: Dr. Peter Schilling, a forensic psychologist. *Id.* (Trial Tr., Index to Videotape #9 at 3, Videotape #9 at 91–92) (Page ID #2022, 2110–11).

---

[1]At times spelled "Jonathan" or "Jonathon."

[2]Goforth initially leveled blame elsewhere, too: he claimed "that an unidentified African-American male had assisted Caudill in the commission of the crimes (an assertion he admitted at trial was a fabrication)." *Caudill I*, 120 S.W.3d at 650.

Caudill's mother, Mary, testified that she "had several difficulties" with her husband while Caudill was growing up and that these difficulties were "related to his alcohol problem." *Id.* (Trial Tr., Videotape #9 at 34) (Page ID #2053). She said that "when he'd get drunk, he was mean" and "physically and mentally abusive" to her and the children. *Id.* at 35 (Page ID #2054). The children "adored their daddy," she explained, but "were scared to death of him" when he had been drinking. *Id.* She added that she and her husband later separated for four months, after which "[h]e never touched a drop" and they reunited. *Id.* at 36 (Page ID #2055). She also stated that Caudill "didn't learn as fast as the other two children" while growing up, and that Caudill had been "teased about her weight" and her glasses as a child. *Id.* at 37 (Page ID #2056). She noted that Caudill had developed a drug problem in high school, but that she was "the most wonderful daughter anybody could ever want" when not on drugs. *Id.*

Caudill's brother, Craig, testified that his and Caudill's father "was bad to drink" and "real abusive to us and my mom." *Id.* at 46 (Page ID #2065). Caudill's counsel responded by asking Craig if his father had been "able to deal with that drinking problem later on in his life." *Id.* Craig said that his father had indeed: "He straightened his life out. He was a totally different person." *Id.* Craig's direct examination then concluded with Craig's agreeing that he "feel[s] better that Virginia is no longer on the streets using" and adding that "[a]t least" he "know[s] where she's at now." *Id.* at 47 (Page ID #2066). All in all, the direct examination of Craig ran a little over two transcript pages of twenty-six lines each.

Caudill's sister, Rhonda, also agreed, when asked, that the siblings' father "had a drinking problem" and "would also come home and could be abusive, verbally and sometimes physically," which she stated was "[v]ery frightening" and made them "[s]cared." *Id.* at 49 (Page ID #2068). "[Y]ou all loved your father," Caudill's counsel offered. "Oh, yes, sir," Rhonda responded. "Uh, but when he was drinking, it was frightening for you?" Caudill's counsel asked. "Yes," Rhonda said. *Id.* at 49–50 (Page ID #2068–69). Rhonda then agreed that Caudill had been "slower to learn," had been teased about her weight growing up, "just wasn't very popular," and had ended up "getting in with the . . . wrong type of people." *Id.* at 50 (Page ID #2069). Rhonda's direct testimony, which also ran a little over two transcript pages,

concluded with her noting that nobody else in her family had a drug problem. *Id.* at 51 (Page ID #2070).

Excluding a sidebar conversation, the testimony of Caudill's daughter, Leslie Nicole, lasts a little under two pages. *See id.* at 52–54 (Page ID #2071–73). It goes, in all relevant parts, as follows:

> COUNSEL: Uh, your—you, you love your mom?
>
> LESLIE NICOLE: Yes.
>
> COUNSEL: Okay. But you know that, uh, there's been some problems in the past in your all's relationship?
>
> LESLIE NICOLE: Yes.
>
> COUNSEL: What's been the cause of that problem?
>
> LESLIE NICOLE: Her drugs and her drinking and her, her boyfriends.
>
> COUNSEL: Uh, when she is not drinking, is not associating with drugs, that kind of culture, what kind of mom is she?
>
> LESLIE NICOLE: She's great.
>
> COUNSEL: Okay.
>
> LESLIE NICOLE: She's good.
>
> COUNSEL: And you've seen the other side, too, when she's using?
>
> LESLIE NICOLE: Yes [crying]. . . .
>
> COUNSEL: Do you believe she's going to be able to get some help for her drug problems, that she's going to be able to—willing to get help with that?
>
> LESLIE NICOLE: Yes, she wants help.
>
> COUNSEL: I believe that's all.

*Id.* at 53–54 (Page ID #2072–73).

Caudill's prison minister, Caroline Worley, testified that Caudill had gone to her prayer services and that Caudill had "encourage[d] some of the other women to come" as well. *Id.* at 56–57 (Page ID #2075–76). She added that Caudill had also accepted books that Worley provided and read them to other inmates, and that Caudill had encouraged another woman to come to Worley to get help for her drug problem. *Id.* at 57 (Page ID #2076). Worley's direct examination ran almost exactly two pages.

The testimony of Caudill's cousin, John Moncrief, in all relevant parts goes as follows:

COUNSEL: [A]re you related to, uh, Virginia Caudill?

MONCRIEF: Yes, I am.

COUNSEL: Uh, how are you related?

MONCRIEF: She's my cousin.

COUNSEL: Okay. And have you had contact with her when she has not been on any kind of drugs and, uh, in the past?

MONCRIEF: Yes, I have. Um, she used to drag race, uh, her boyfriend's car, and I'd go up there every Sunday to Clay City and spend time with her.

COUNSEL: Okay. Okay. What kind of person is she when she's, uh, not on—using drugs?

MONCRIEF: She's a good person.

COUNSEL: Okay. And have you been able to visit her at the jail?

MONCRIEF: Yes, I have.

COUNSEL: Uh, do you feel that, uh, she is, uh, attempting to turn her life around?

MONCRIEF: Yes, she is.

COUNSEL: I believe that's all I have.

*Id.* at 87 (Page ID #2106). Moncrief's testimony lasted roughly one page.

Dr. Schilling, the forensic psychologist and sole expert witness whom the defense called during the penalty phase, testified that he had performed a psychological evaluation of Caudill based on four visits with her. *Id.* at 92 (Page ID #2111). He explained that having "an alcoholic father who was emotionally and physically abusive" had been "branded into [Caudill] in a way that . . . was very hard for her to escape." *Id.* at 94 (Page ID #2113). He discussed a series of relationships—including two early marriages—that had featured threats of violence or actual violence, *id.* at 95–97 (Page ID #2114–16), including one boyfriend who had broken "her wrist, nose and jaw at various times" and "repeatedly struck her in the face throughout their relationships," *id.* at 96 (Page ID #2115). He noted that "she's been hit in the face by men she's been in relationships with more times than she can remember," at least once losing consciousness, and that she had worked at times as a prostitute. *Id.* He also discussed at some length Caudill's history of drug use and addiction. *Id.* at 97–99 (Page ID #2116–18). And he

noted that there was "highly unusual," "extreme variation" in her cognitive abilities, with some scores "in the gifted" or "perhaps even genius range" and others "way below average." *Id.* at 99–100 (Page ID #2118–19). He concluded that variation was the result of "brain damage" from some combination of "the head trauma" and "years of . . . drug abuse" that Caudill's brain had sustained, or alternatively a long-undiagnosed learning disability, or possibly both. *Id.* at 100 (Page ID #2119). Finally, Schilling testified that, based on personality tests he had conducted, Caudill's results "show[ed] that she is about as submissive as you can get," "particularly with respect to men." *Id.* at 106 (Page ID #2125).

At the conclusion of the trial's penalty phase, the jury sentenced both Caudill and Goforth to death. *Caudill I*, 120 S.W.3d at 648.

## B.  Postconviction Investigation and Proceedings

In the wake of their death sentences, Caudill and Goforth appealed directly to the Kentucky Supreme Court, as provided in the Kentucky Constitution, KY. CONST. § 110(2)(b), and by state law, KY. REV. STAT. § 532.075(1). After that effort was unsuccessful, Caudill commenced state post-conviction review under Kentucky Rule of Criminal Procedure 11.42 (RCr 11.42). *See Caudill v. Commonwealth* (*Caudill II*), No. 2006-SC-457-MR, 2009 WL 1110398, at *1 (Ky. Apr. 23, 2009). Caudill raised a series of claims, including an ineffective-assistance-of-counsel claim alleging that "defense counsel was ineffective in the presentation of mitigation evidence during the penalty phase of the trial." *See id.* at *4.

Caudill filed documentation in support of this claim. Her new counsel's postconviction investigation revealed that:

> ● Susan Snyder, the mitigation specialist whom Caudill's trial counsel had enlisted, had written to Caudill's attorney a little under two months before trial stating that it had thus far been "impossible . . . to piece together a 'tight' Mitigation Plan due to the fact that there is so much necessary data missing." RCr 11.42 App. (Vol. 5, Ex. S, p. 584). She wrote that "we need help, A.S.A.P.," *id.*, that she was approaching "the frantic stage," *id.* (p. 585), and that she hoped that Caudill would "be more motivated to help [her] in contacting her family, and potential necessary witnesses," *id.* She also enclosed a list of outstanding documents. *Id.* (p. 584). At the

bottom of the page, scrawled by hand and circled, are the words: "Help! Please!" *Id.* (p. 585).

● Caudill's grandmother, Vina Caudill, "would have testified at [Caudill's] trial but no one ever asked [her] to testify." *Id.* (Vol. 5, Ex. V, p. 592). Had she been called to testify, she would have testified that Caudill's father "would get drunk every weekend or so and would slap and hit Mary [Caudill's mother] in front of the children," that Caudill "was very afraid of her father and once I crawled in bed with her because she was a nervous wreck and shaking uncontrollably," and "[s]ometime[s] the children would pull Kirby [Caudill's father] off Mary and prevent him from hurting her." *Id.*

● Caudill's next-door neighbor from growing up, Ruth Brown, "love[s]" Caudill, "ha[s] never seen [her] violent," and "would have gladly testified at the first trial, but . . . was not asked to." *Id.* (Vol. 5, Ex. W, p. 595). Had Brown been called to testify, she would have testified that "Mary never talked about Kirby abusing her," but that she knew that he had "because one night Kirby was drunk and shooting his rifle at Mary" and Brown "saw Mary running from Kirby down the tracks in her nightgown at 2:00 am." *Id.*

● Caudill's second cousin, Barbara Watson, "was never interviewed" by Caudill's mitigation team, despite having "been easy to contact" by virtue of "liv[ing] only a few miles from the family." *Id.* (Vol. 5, Ex. X, p. 598). Had she been called to testify, she would have testified that she "recall[ed] [Caudill] being attracted to older abusive men like her father," one of whom threatened to "whip" Watson. *Id.* Watson also would have testified that "Mary and Kirby treated Virginia differently from the other two children," *id.*, that Kirby Caudill "liked to pull a gun out when he drank," including at "family functions," and that Kirby Caudill once "took Mary to the community dump where everyone took their garbage and where people would go to shoot rats" and "threatened to shoot Mary" there, *id.* (p. 599). Watson also would have testified that Kirby Caudill once, while holding a shotgun in a car in which Caudill was riding in the back seat, "made [Caudill] tell him where Mary was." *Id.*

● Several ex-boyfriends of Caudill's, including one who admittedly abused her, would have testified to Virginia's nonviolent character and history as a victim of domestic abuse. *See id.* (Vol. 5, Ex. Z, pp. 608–10) (Ray Towery, discussing abuse Caudill suffered at the hands of another ex-boyfriend who beat her and "encouraged [her] to begin prostituting"); *id.* (Vol. 5, Ex. AA, pp. 611–13) (Mike Sipple, discussing Caudill's reports that "her life was filled with alcoholic and abusive men"); *id.* (Vol. 5, Ex. BB, pp. 614–17) (Ronnie Ray Hopkins, admitting to knocking Caudill unconscious and playing a role in her becoming addicted to crack cocaine).

● A domestic-abuse counselor named Billie Davenport could have testified further to Caudill's history as a victim of domestic violence and what studies show about the effects of domestic violence on children who witness it. *Id.* (Vol. 5, Ex. CC, pp. 618, 620–24); *see also id.* (Vol. 6, Exs. DD–FF, pp. 625–73) (health records detailing history of domestic abuse suffered).

● Dr. Schilling, the forensic psychologist, never received Susan Snyder's "final report" because he "didn't feel it was [his] duty to drive to Ms. Snyder's to get it." *Id.* (Vol. 6, Ex. GG, p. 675). Had he received this report, it would have "assisted in an accurate mental health evaluation of [Caudill]." *Id.* The letter he received from Snyder did not in fact enclose a list of needed documents because an investigator, John Baldridge, had been "unsuccessful in receiving a lot of the information she requested including school records, hospital records, places of employment, training and potential people to interview." *Id.*; *see also id.* (p. 678–79) (attached letter from Snyder with handwritten note at bottom). Schilling never received those records or other "records [he] needed," including "school records or medical records" and "police reports" that "would have informed [his] diagnosis." *Id.* (pp. 675–76).

● Dr. Allen, the neuropsychologist who was not called to testify, "never spoke with or met with" Caudill's trial attorney about his findings or any other subject "at all." *Id.* (Vol. 6, Ex. HH, p. 681). He "did not receive needed medical records for [Caudill], which are routine in cases such as this," and "[t]he time for preparing [his] report was so short that [he] was not able to complete a rout[in]e follow-up with Virginia following [his] evaluation." *Id.* Allen concluded from his evaluation that Caudill "showed probable cerebral brain damage like that of a stroke." *Id.* Allen's report also states that Caudill told him that "her father drank heavily and was abusive to her mother for a five-year period during her late childhood and early adolescence," but Caudill "denied that her father was in any way abusive to her or her siblings." *Id.* (Vol. 6, Ex. II, p. 684).

● Caudill's mother, Mary, had been "told . . . in the morning" on the day that she testified as part of the sentencing phase of Caudill's trial "that [she] would testify that afternoon." *Id.* (Vol. 6, Ex. II, p. 695). "The short notice blind-sided [her]." *Id.* She spent "15 minutes" with Caudill's trial attorney "during the recess in preparation for testimony" but received no other preparation. *Id.* Had she been more prepared, she could have testified to her husband's physical abuse of the children, the "many occasions" that Kirby had "tried to kill [her]," the times that Kirby had "threatened [her] with knives and guns in front of the children," *id.* (p. 693), the time that Kirby "shot a hole through the front door of the trailer and two or three shots through the window of the trailer" where she was staying, the time that Kirby "shot a rifle at [her] that blew a hole through

the door of our house" while "[t]he children were in their bedrooms," *id.* (p. 694), and the fact that while Caudill's brother and sister "would try and fight back with their father," Caudill "was real quiet and would cry as she hid under the bed," *id.* (p. 695).

- Caudill's brother, Craig, never spoke with Caudill's attorney before the day that he testified and did not feel that he had been given "an opportunity to tell the jury" that their father had "would beat [him], Virginia, and Rhonda senseless until he brought blood," using "sticks, belts, and other objects" and sometimes "threaten[ing] [them] with his gun." *Id.* (Vol. 6, Ex. KK, p. 698). He would have added that their father "hit us full force with his fist, kicked us with his shoes on, and threw objects which struck us." *Id.* (p. 699). In addition, he would have testified that all three children "were terrified of [their] father," who "threatened to kill" them and their mother "on many occasions," and that Caudill "was the most submissive of the three children" and once "urinated on herself out of fear of" her father. *Id.*

- Caudill's sister, Rhonda, met with Caudill's attorney "a few minutes before [she] was to testify" in the sentencing phase of Caudill's trial and also felt she did not have a "sufficient opportunity to speak to the jury about [her] father's abusive behavior toward Virginia and [her] mother." *Id.* (Vol. 6, Ex. LL, p. 702). Had she had the opportunity to testify further, she would have testified that her father "regularly beat [her] mother in front of us," that she "remember[s] stopping [her] father's beating by striking him over the head with a picture from the wall" while she "was ten years old." *Id.*

On April 23, 2009, the Kentucky Supreme Court denied Caudill's appeal. *Caudill II*, 2009 WL 1110398, at *11. With regard to her ineffective-assistance-of-counsel claim asserting inadequate representation in presenting a mitigation case, the court reasoned that because "[d]efense counsel's investigation and presentation of mitigation evidence in this case revealed Caudill's abusive childhood, her substance abuse issues, her violent relationships with males, and her cognitive deficiencies," there was no indication in the record that counsel had failed to render constitutionally adequate representation. *Id.* at *5. "That additional witnesses existed who would have corroborated or expanded upon this testimony," the court concluded, "does not amount to deficient performance by counsel." *Id.* Having decided the case on the ground of constitutionally adequate performance, the court did not address whether Caudill had been prejudiced. *See id.*

## II. DISCUSSION

Under *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner's ineffective-assistance-of-counsel claim succeeds only if (1) her "counsel's performance was deficient," and (2) this "deficient performance prejudiced the defense." *Id.* at 687. To satisfy the first prong of this test, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms" and "considering all the circumstances." *Id.* at 688. Applying this "highly deferential" scrutiny, courts must not simply "second-guess counsel's assistance after conviction or adverse sentence," but rather must make "every effort . . . to eliminate the distorting effects of hindsight" and "evaluate the conduct from counsel's perspective at the time," "indulg[ing] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and strategy. *Id.* at 689.

As the majority notes, because Caudill is a habeas petitioner, AEDPA provides that we may not grant her petition with regard to any state-court adjudication on the merits "unless the adjudication resulted in a decision that: (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Hodges v. Colson*, 727 F.3d 517, 525 (6th Cir. 2013) (citing 28 U.S.C. § 2254(d)). Because the Kentucky Supreme Court found that Caudill's trial counsel's performance was constitutionally adequate but did not address prejudice, we give AEDPA deference to its performance determination but consider the prejudice prong de novo. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *Hodges*, 727 F.3d at 537.

Because AEDPA itself requires a deferential look at the determinations of state courts, when AEDPA applies to constrain a federal court's review of a state court's judgment on an ineffective-assistance-of-counsel claim, review "is thus 'doubly deferential.'" *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). "The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). "Even in the context of federal habeas," however, "deference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## A.  Performance

As indicated above, *Strickland* affords attorneys "wide latitude" to make strategic decisions in representing their clients.  *Strickland*, 466 U.S. at 689.  But while "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, . . . strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Strickland*, 466 U.S. at 690–91.  "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Id.* at 691.

Here, Caudill claims that her trial counsel failed to meet that duty by insufficiently investigating, discovering, and presenting evidence to support a meaningful mitigation case.  More specifically, she argues, her trial counsel (a) failed to prepare and support most of the witnesses that counsel did call (either by failing to consult with them beforehand or by failing to provide them with key documents),[3] and (b) failed to call (or even, in most cases, discover) other potentially powerful mitigation witnesses.  *See* Appellant's Br. at 16–18.  Despite AEDPA's deferential standard of review, Caudill's overarching argument—that counsel's mitigation effort

---

[3]I would not brush this line of argument aside, as the majority does.  Maj. Op. at 13–14.  While it is true that the relevant portion of Caudill's COA refers to "whether Caudill's trial counsel was constitutionally ineffective for failing to call additional witnesses during the penalty phase of proceedings," *Caudill v. Conover*, No. 14-5418, at 12 (6th Cir. May 11, 2016), "a COA's failure to indicate an issue is not" jurisdictional, *Gonzalez v. Thaler*, 565 U.S. 134, 143 (2012).  We thus still have "subject-matter jurisdiction to adjudicate" this claim, *id.* at 137, as well as the "ability to grant a COA in the first instance at [our] own discretion," *Johnson v. Hudson*, 421 F. App'x 568, 570 n.1 (6th Cir. 2011).  There is no reason that we could not do so here.  Meanwhile, the Warden—fully aware of this line of argument from Caudill's opening brief (not to mention her federal habeas petition and RCr 11.42 pleadings)—did not argue that Caudill had exceeded the scope of her COA and instead simply responded to Caudill's substantive arguments.  *See* Appellee's Br. at 26–27.  Under such circumstances, there is especially good cause to consider the full range of Caudill's arguments.  *Cf. Cummings v. City of Akron*, 418 F.3d 676, 681–82 (6th Cir. 2005) (explaining why claim that plaintiff failed to raise in complaint should still go forward where defendant had notice, did not object, and issue was fully briefed).  And that this is a capital case only makes the cause greater.  *Cf., e.g., California v. Ramos*, 463 U.S. 992, 998–99 (1983) ("The Court, as well as the separate opinions of a majority of the individual Justices, has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.").  Finally, even if we were to restrict our formal *ruling* to the terms of the COA, our task in assessing deficiency here is to separate genuine "strategic decision[s]" from "*post hoc* rationalization[s]" dressed up to mask what was truly "inattention."  *See Wiggins*, 539 U.S. at 526–27.  If trial counsel's preparation and support for the witnesses that he *did* call was lackadaisical at best, then it is all the more likely that trial counsel's investigation and assessment of other, *potential* witnesses was equally careless.

was constitutionally deficient—has merit: the facts reveal a mitigation effort that was so cursory that there is "no reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

### 1. Failure to prepare and support existing witnesses

The Kentucky Supreme Court rejected Caudill's claim on the theory that it asserted merely that "defense counsel failed to present *more* mitigation evidence of the same quality that had already been presented." *Caudill II*, 2009 WL 1110398, at *5. Although Caudill's trial counsel called five family members and one lay witness to the stand (as well as the one expert), the record reveals that these direct examinations were pitifully underdeveloped. Counsel developed only a brief and sanitized version of Caudill's father's dramatic abuse—qualified, bafflingly, with discussion of his later repentance—from Caudill's mother, Mary Caudill, R. 47-10 (Trial Tr., Videotape #9 at 34–36) (Page ID #2053–55), despite the fact that postconviction investigation revealed that he had "tried to kill [her] many times," RCr 11.42 App. (Vol. 6, Ex. II, p. 695), had "threatened [her] with knives and guns in front of the children," *id.* (p. 693), had once "shot a hole through the front door of the trailer and two or three shots through the window of the trailer" where she was staying, and had "shot a rifle at [her] that blew a hole through the door of our house" while "[t]he children were in their bedrooms," *id.* (p. 694).

It is true, as the Warden argues, that "the opportunity was there for expansion of [her] answer[]" and that "counsel cannot testify for [her]." Appellee's Br. at 27. But counsel *can*, and moreover must, conduct a rudimentary investigation and preparation of counsel's witnesses. *See Foust v. Houk*, 655 F.3d 524, 535 (6th Cir. 2011) (finding deficient performance where trial counsel "failed to interview any of [the defendant's] siblings" and "did not interview [the defendant's] parents before they testified at the mitigation hearing," while providing only perfunctory guidance to them); *Jells v. Mitchell*, 538 F.3d 478, 493 (6th Cir. 2008) (granting habeas relief where petitioner's "counsel interviewed only three family members" and, "[w]hen speaking with the family members they did contact, their inquiry was brief and they failed to ask sufficiently probing questions"). In this case, Mary Caudill's failure at trial to provide an accurate and vivid account of her husband's abuse seems to have stemmed from Mary's having been "told . . . in the morning" on the day of her testimony that she "that [she] would testify that

afternoon," and moreover from her having been able to spend only "15 minutes" with Caudill's trial attorney "during the recess in preparation for testimony" while receiving no other preparation. RCr 11.42 App. (Vol. 6, Ex. II, p. 695). Constitutionally adequate counsel would have had a conversation with a crucial mitigation witness like Mary Caudill that lasted longer than fifteen minutes and that occurred before the day of her testimony.

Craig and Rhonda's testimony shows the same pattern of perfunctory representation. Each had vivid and disturbing things to say about their father's abuse: how he "would beat [them] senseless until he brought blood," using "sticks, belts, and other objects" and sometimes "threaten[ing] [them] with his gun," *id.* (Vol. 6, Ex. KK, p. 698); how he would "hit [them] full force with his fist, kick[] [them] with his shoes on, and thr[o]w objects" at them, *id.* (p. 699); how Caudill "was the most submissive of the three children" and was so terrified of her father that she once "urinated on herself out of fear of" him, *id.*; and how their father "regularly beat [their] mother in front of [them]," at times forcing the other children (though as far as we know never Caudill herself) to try to stop his beating with violence, *id.* (Vol. 6, Ex. LL, p. 702). Yet none of these details came out in their testimony. Rather, Caudill's lawyer asked both of them an extremely brief and anodyne series of questions, each barely lasting two pages on a double-spaced transcript. *See* R. 47-10 (Trial Tr., Videotape #9 at 46–48) (Page ID #2065–67); *id.* at 49–51 (Page ID #2068–70). Neither, meanwhile, seems to have even spoken to Caudill's trial counsel prior to the day of their testimony, nor does it appear that either of them spoke to him more than "a few minutes before [they were] to testify" even then. RCr 11.42 App. (Vol. 6, Ex. KK, p. 698); *id.* (Vol. 6, Ex. LL, p. 702). And Caudill's trial counsel's examination of the other three lay witnesses that he called was equally, if not more, pathetic, with none exceeding two transcript pages and all three (like Mary's, Craig's, and Rhonda's direct examinations) reading like a "few naked pleas for mercy," *Rompilla v. Beard*, 545 U.S. 374, 393 (2005), rather than a constitutionally adequate mitigation case.

Caudill's counsel's limited exploration of this potentially powerful mitigating evidence demonstrates deficient representation. "In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate

further." *Wiggins*, 539 U.S. at 527. Thus, an attorney who "present[s] *some* evidence at [a] mitigation" hearing—even if that evidence provides the broad contours of mitigation theory—may still be constitutionally ineffective if that attorney fails to acquire sufficient details to support a "reasonable professional judgment to limit their investigation" from going further. *Foust*, 655 F.3d at 538.

Accordingly, in *Johnson v. Bagley*, 544 F.3d 592 (6th Cir. 2008), we observed that even though the defendant's counsel "interviewed [five] witnesses and submitted some testimony regarding Johnson's troubled [childhood]," counsel was not off the hook from digging further, given that digging further would have been the only reasonable response to such a promising but underdeveloped lead. *See id.* at 602. As we made clear, "an unreasonably truncated mitigation investigation is not cured simply because some steps were taken prior to the penalty-phase hearing and because some evidence was placed before the jury." *Id.* (citing *Rompilla*, 545 U.S. at 382–83); *see also id.* at 599 (observing that "[a]t a surface level, it appears that Johnson's counsel considered all of [the options outlined in the ABA Guidelines], performed some investigation with respect to each option and deployed some of these strategies").

The same logic applies here: Caudill's counsel knew that Caudill had a "horrific childhood," but "only scratched the surface of" it through the testimony presented, *id.* at 602, throwing witnesses on the stand with scant preparation and leading them through a rote and emotionless recitation of the fact that Caudill's father was a "mean" drunk, R. 47-10 (Trial Tr., Videotape #9 at 35) (Page ID #2054). But mean is not the same as murderous, and having your father come home and be mean is not the same as having your father come home and try to kill your mother. Nor is being "scared" of your father, *id.* at 49 (Page ID #2068), the same thing as being so scared that you urinate on yourself because of him, RCr 11.42 App. (Vol. 6, Ex. KK, p. 699). Just because counsel learned *something* does not mean that counsel was not obligated to try to learn *more*.

Defense counsel's failure to provide its expert witnesses with necessary documents further indicates that counsel's "incomplete investigation was the result of inattention, not reasoned strategic judgment." *See Wiggins*, 539 U.S. at 534. The mitigation specialist employed by defense counsel, Susan Snyder, had warned a little less than two months before trial that it

had thus far been "impossible . . . to piece together a 'tight' Mitigation Plan due to the fact that there is so much necessary data missing." RCr 11.42 App. (Vol. 5, Ex. S, p. 584). The affidavits of the two psychological experts—Drs. Allen and Schilling—confirm the general lack of organization in the defense team: Schilling, for one, evidently never received Snyder's report because he "didn't feel it was [his] duty to drive to Ms. Snyder's to get it," *id.* (Vol. 6, Ex. GG, p. 675), nor did he receive other information, like "school records or medical records" or "police reports" that "would have informed [his] diagnosis," *id.* (p. 676). And Allen, the neuropsychologist who was not called to testify, "never spoke with or met with" Caudill's trial attorney about his findings or any other subject "at all" and "did not receive needed medical records for [Caudill], which," he explained, "are routine in cases such as this." *Id.* (Vol. 6, Ex. HH, p. 681). In fact, "[t]he time" that Allen had "for preparing [his] report was so short that [he] was not able to complete a rout[in]e follow-up with Virginia following [his] evaluation." *Id.* And as the postconviction investigation revealed, there were in fact voluminous medical records detailing the injuries that Caudill had suffered at the hands of abusive partners. *See id.* (Vol. 6, Exs. DD–FF, pp. 625–73).[4]

Here, defense counsel was well aware that his client had suffered domestic abuse ranging from childhood to adulthood, that this abuse was relevant to both basic mitigation and residual doubts about guilt, and that at least some of his expert witnesses lacked routine records that they were expecting. The defense's own mitigation specialist had warned counsel that these records were needed "A.S.A.P." and that she was she was approaching "the frantic stage." *Id.* (Vol. 5, Ex. S, p. 585). Though prejudice, as the district court pointed out, is a separate question, R. 34

---

[4]The Warden argues that "to the extent that any problems did occur, they were related to the investigator's inability to get documents that the mitigation team had sought (through no fault of his own), or involved Caudill's lack of motivation to assist her mitigation team (particularly in regard to family members)." Appellee's Br. at 24. Caudill notes in response, however, that "investigators are agents of attorneys and work at their direction—a failure of the investigator *is* a failure of the attorney." Reply Br. at 14 (citing KY. SUP. CT. R. 3.130(5.3) ("Responsibilities regarding nonlawyer assistants.")). Regardless of whether that particular rule applies here, Caudill has the better of this argument: it is clearly established that defense attorneys are ultimately the ones responsible for the reasonableness of an investigation. *See, e.g.*, *Rompilla*, 545 U.S. at 377 (holding that the "*lawyer* is bound to make reasonable efforts to obtain and review" relevant material (emphasis added)); *cf. Johnson*, 544 F.3d at 601–03 (relying in part on chaos and inexperience among nonlawyer members of the mitigation team to find deficient performance). Likewise, a client's unhelpfulness is not a bar to a finding of ineffective assistance when other indications make clear that an attorney ought to investigate further. *See Rompilla*, 545 U.S. at 381–83. And such records, the Supreme Court has made clear, can be crucial components of a mitigation case. *See, e.g.*, *Wiggins*, 539 U.S. at 516–17, 523–25.

(Dist. Ct. Op. & Order at 103) (Page ID #534), it is hard to see how counsel's failure to obtain these documents and ensure that all necessary documents got into the right hands can reasonably be said to have constituted "reasonable professional assistance" or "sound trial strategy." *Strickland*, 466 U.S. at 689 (citation omitted); *see also Foust*, 655 F.3d at 535 (finding it impossible to "fathom why counsel failed to obtain" Children's Services records, given that "counsel's strategy was to evoke sympathy for [the defendant] based on the deplorable conditions of his childhood" and a retained expert's having "repeatedly reminded counsel of the importance of gathering the records"). Rather, it appears to be one more piece of evidence that Caudill's counsel performed "an anemic and leaderless investigation." *Johnson*, 544 F.3d at 600.

### 2. Failure to discover and call additional witnesses

In addition to failing adequately to prepare and interview the mitigation witnesses that Caudill's trial counsel *did* call, counsel also failed to reach out beyond that circle to others who could speak to Caudill's troubled past. To be sure, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up" to help their client. *Rompilla*, 545 U.S. at 383. Where, for example, counsel has already learned about a defendant's life in vivid detail, counsel cannot be "fault[ed] . . . for failing to find more." *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009). That is because "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." *Id.*

This is not, however, one of those cases. Rather, as discussed above, there is no indication that Caudill's counsel ever did the due diligence required to learn anything more than the basic fact that Caudill's father was a drunk, and "when he'd get drunk, he was mean." R. 47-10 (Trial Tr., Videotape #9 at 35) (Page ID #2054). That is far from an exhaustive account of the situation, and simply knowing that a defendant had a father who was a mean drunk cannot possibly shut off need for further investigation. After all, when the information known is basic but promising, it should trigger *further* investigation by any reasonable attorney. *See Wiggins*, 539 U.S. at 527; *Johnson*, 544 F.3d at 600 (observing that defendant's mother's "'bad background' is precisely what should have prompted the defense team to interview her"). Here,

Caudill's counsel had discovered that there was an extremely powerful line of mitigation evidence that would also support Caudill's narrative with regard to the unresolved question of who actually killed Lonetta White. *See Caudill I*, 120 S.W.3d at 648. There is no reasonable explanation for Caudill's counsel's failure to undertake something more than the most cursory glance into that line of investigation. *See Foust*, 655 F.3d at 330.

If counsel had undertaken an even slightly more in-depth investigation, counsel would have discovered powerful and vivid details that would have told even more about the abuse that Mary, Craig, and Rhonda discussed in their postconviction affidavits. Counsel could have learned from Caudill's grandmother, for example, that Caudill's father "would get drunk every weekend or so and would slap and hit Mary [Caudill's mother] in front of the children" and that they would at times have to pull Caudill's father "off Mary and prevent him from hurting her." RCr 11.42 App. (Vol. 5, Ex. V, p. 592). Counsel could have learned from Caudill's childhood next-door neighbor that she had once seen Caudill's father "drunk and shooting his rifle at Mary" as she ran down the railroad "tracks in her nightgown at 2:00 am." RCr 11.42 App. (Vol. 5, Ex. W, p. 595). Counsel could have learned from Caudill's cousin Barbara Watson that Caudill's father once "took Mary to the community dump where everyone took their garbage and where people would go to shoot rats" and "threatened to shoot Mary" there, and that he once, while holding a shotgun in a car in which Caudill was riding in the back seat, "made [Caudill] tell him where Mary was." RCr 11.42 App. (Vol. 5, Ex. X, p. 599). And counsel could have learned about the brutal history of domestic violence that Caudill suffered from medical records and from some of her ex-boyfriends themselves, *id.* (Vol. 5, Ex. Z, pp. 608–10) (Ray Towery, discussing abuse Caudill suffered at the hands of another ex-boyfriend who beat her and "encouraged [her] to begin prostituting"); *id.* (Vol. 5, Ex. AA, pp. 611–13) (Mike Sipple, discussing Caudill's reports that "her life was filled with alcoholic and abusive men"); *id.* (Vol. 5, Ex. BB, p. 614–17) (Ronnie Ray Hopkins, admitting to knocking Caudill unconscious and playing a role in her becoming addicted to crack cocaine)—evidence that would have necessarily bolstered and expanded upon the self-reports of such abuse recounted by Dr. Schilling, R. 47-10 (Trial Tr., Videotape #9 at 95–97) (Page ID #2114–16). *See Skipper v. South Carolina*, 476 U.S. 1, 8 (1986) ("The evidence petitioner was allowed to present . . . was the sort of evidence that a

jury naturally would tend to discount as self-serving.  The testimony of more disinterested witnesses . . . would quite naturally be given much greater weight by the jury.").[5]

The Kentucky Supreme Court rejected this argument, reasoning that the fact "[t]hat additional witnesses existed who would have corroborated or expanded upon [existing] testimony does not amount to deficient performance by counsel."[6]  *Caudill II*, 2009 WL 1110398, at *5.  But this rationale, in light of counsel's woeful job with the witnesses that counsel *did* call, misses the point.  Although it is possible that counsel *could* have learned enough from existing witnesses to render these additional sources cumulative and unnecessary, *see, e.g.*, *Van Hook*, 558 U.S. at 11–12, the record reveals that counsel did *not* go to the trouble of learning nearly enough from those witnesses.  *See Johnson*, 544 F.3d at 603 ("Johnson's attorneys 'were not in a position to make . . . reasonable strategic choice[s] . . . because the investigation supporting their choice[s] was [itself] unreasonable." (quoting *Wiggins*, 539 U.S. at 536)).  No raw number of witnesses called can immunize counsel against unreasonably failing to pursue additional evidence that would obviously be useful.  *See Rompilla*, 545 U.S. at 378, 381–83 (finding counsel's performance deficient for failing to look into client's felony convictions even after speaking with five family witnesses and three mental-health experts); *cf. Sears v. Upton*, 561 U.S. 945, 955 (2010) ("We certainly have never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant.").  What is significant here is that while counsel called what sounds like a respectable number of witnesses during the trial's sentencing phase, the investigation that counsel seems to have *done* with regard to those witnesses'

---

[5]To be clear, these were not far-flung witnesses whom counsel would have had to "scour the globe," *Rompilla*, 545 U.S. at 383, to find.  They all appear to have lived nearby, and even the witness who is arguably least obvious, Caudill's cousin Barbara, would have "been easy to contact" by virtue of "liv[ing] only a few miles from the family."  RCr 11.42 App. (Vol. 5, Ex. X, p. 598).

[6]The Kentucky Supreme Court supported this argument in part by noting that "Caudill's mother, brother, and sister . . . gave details of Caudill's kindness as a child, her struggle with substance abuse, and her history of abusive relationships with men."  *Caudill II*, 2009 WL 1110398, at *5.  But the transcript of "all three family members[']" testimony, as Caudill points out, "contain[s] no mention of Virginia's domestic abuse, much less of the repeated abuse by multiple men."  Appellant's Br. at 59; *see* R. 47-10 (Trial Tr., Videotape #9 at 34–41) (Page ID #2053–60) (Mary Caudill); *id.* at 46–48 (Page ID #2065–67) (Craig Caudill); *id.* at 49–51 (Page ID #2068–70) (Rhonda Caudill Whitt).  "This partial reliance on an erroneous factual finding further highlights the unreasonableness of the state court's decision." *Wiggins*, 539 U.S. at 528.

testimony was so perfunctory that it cannot reasonably be said that no further investigation was necessary.  Counsel had an obligation to follow reasonably available additional leads, and counsel did not meet this obligation.**7**

The nature of Caudill's guilt and sentencing theories further reveal that Caudill's counsel's "failure to investigate thoroughly . . . resulted from inattention, not reasoned strategic judgment." *Wiggins*, 539 U.S. at 526.  As noted above, we must defer to "strategic choices made after thorough investigation," *Strickland*, 466 U.S. at 690, but no such deference is owed where defense counsel's choices not to learn more are not themselves reasonable, *id.* at 691; *Wiggins*, 539 U.S. at 521–22.  Where, for example, a particular line of inquiry would conflict with a planned defense theory or likely yield damaging information, trial counsel has leeway to make tactical decisions to follow that line of inquiry no further.  *See, e.g., Wong v. Belmontes*, 558 U.S. 15, 25–28 (2009); *Burger v. Kemp*, 483 U.S. 776, 793–95 (1987); *Darden v. Wainwright*, 477 U.S. 168, 186 (1986); *Strickland*, 466 U.S. at 699.  By contrast, where additional mitigating evidence would reinforce a planned or anticipated argument, *see Wiggins*, 539 U.S. at 525, 535, or rebut an easily anticipated prosecution argument, *see Rompilla*, 545 U.S. at 383, counsel's failure to investigate further is highly suspect.

In this case, counsel clearly had launched down the road of arguing that Caudill's troubled childhood and abusive father mitigated her guilt.  Those theories fit extremely well with the residual doubt about who between Caudill and Goforth had actually committed the murder and Caudill's corresponding argument that Goforth was one more in a long line of violent, domineering men who had abused and controlled her.  *See, e.g.*, R. 47-10 (Trial Tr., Videotape #9 at 179–92) (Page ID #2198–2211).  Caudill's trial counsel thus "had every reason to develop

---

**7**Caudill also challenges defense counsel's failure to call Dr. Allen, the neuropsychologist.  *See, e.g.*, Appellant's Br. at 60.  Here, I agree with the majority.  Allen's report contained information that could have been useful to Caudill's mitigation, but also included the potentially harmful observation that Caudill had "denied that her father was in any way abusive to her or her siblings" in their interview.  RCr 11.42 App. (Vol. 6, Ex. II, p. 684).  To be clear, that statement to Allen does not necessarily discredit Caudill's mitigation case:  Caudill would not have been the first capital defendant to provide falsely "obstructive" information to her defense team, *see, e.g.*, *Rompilla*, 545 U.S. at 381, and victims of childhood abuse often deny or try to conceal such abuse, *see* Phyllis L. Crocker, *Childhood Abuse and Adult Murder: Implications for the Death Penalty*, 77 N.C. L. REV. 1143, 1196–97 (1999).  Nevertheless, it is hard to impugn a defense attorney's strategic choice to keep the statement away from the jury given the centrality of that abuse to Caudill's mitigation case.  The Kentucky Supreme Court's rejection of this particular argument was reasonable.

the most powerful mitigation case possible." *Wiggins*, 539 U.S. at 526. His failure to do so betokens a "halfhearted mitigation case," *id.*, rather than a "tactical judgment not to present mitigating evidence . . . and to pursue an alternative strategy instead," *id.* at 521. In my view, then, the Kentucky Supreme Court's ruling that counsel's performance was constitutionally sufficient was an unreasonable application of clearly established law.

## B. Prejudice

To satisfy the prejudice prong of the *Strickland* test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In the case of a death sentence, that means "a reasonable probability that at least one juror would have struck a different balance" and voted against imposing death. *Wiggins*, 539 U.S. at 537. We analyze this question by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *Id.* at 534. And because the Kentucky Supreme Court did not reach this prong, we consider the question de novo. *See id.* at 534; *Hodges*, 727 F.3d at 537.

As we have summarized the rules governing this analysis:

> "[I]n order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir.), *cert. denied*, 546 U.S. 1039 (2005). In other cases, we have found prejudice because the new mitigating evidence is "different from and much stronger than the evidence presented on direct appeal," "much more extensive, powerful, and corroborated," and "sufficiently different and weighty." *Goodwin v. Johnson*, 632 F.3d 301, 328, 331 (6th Cir. 2011). We have also based our assessment on "the volume and compelling nature of th[e new] evidence." *Morales v. Mitchell*, 507 F.3d 916, 935 (6th Cir. 2007). If the testimony "would have added nothing of value," then its absence was not prejudicial. *Van Hook*, 558 U.S. at 12. In short, "cumulative mitigation evidence" will not suffice. *Landrum v. Mitchell*, 625 F.3d 905, 930 (6th Cir. 2010), *cert. denied*, 565 U.S. 830 (2011).

*Foust*, 655 F.3d at 539.

Here, Caudill's evidence does "differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Hill*, 400 F.3d at 319. To begin with, the evidence that counsel failed to discover and elicit is both more powerful, and expands into more disturbing themes, than what came out in testimony: instead of painting Caudill's father as a mean drunk who later pulled himself together, it paints him as a monster who exposed Caudill to extraordinary trauma and violence from an early age. Although at a high-enough level of generality this evidence can be categorized under the broad heading of "childhood abuse," that is true of much noncumulative evidence. *See Johnson*, 544 F.3d at 604 (finding prejudice where defense uncovered abuse by mother but not by grandmother); *see also Foust*, 655 F.3d at 540 ("Because the facts adduced at the mitigation hearing on this point were neither numerous nor detailed, we conclude that the new evidence is substantially different and not cumulative."). The evidence that counsel failed to find and elicit here "reveals far more than 'minor additional details.'" *Foust*, 655 F.3d at 545 (quoting *Van Hook*, 558 U.S. at 12). Rather, it differs in both "strength and subject matter," *Hill*, 400 F.3d at 319, by providing vivid detail about Caudill's father, showing that he was not only mean and at times physically abusive, but that he regularly brandished weapons—including deadly weapons—at his wife and their children. "Far from being cumulative, the new evidence paints an altogether different"—and darker—picture of Caudill's childhood and relationships with men since. *Foust*, 655 F.3d at 539.

The testimony and records that counsel failed to discover and present also differed from what was already introduced by corroborating Caudill's own claims, relayed through Dr. Schilling's testimony, R. 47-10 (Trial Tr., Videotape #9 at 95–97) (Page ID #2114–16), about the abuse that Caudill suffered at the hands of various domestic partners throughout her life. The Supreme Court has made clear, however, that evidence is not cumulative when it corroborates testimony "that a jury naturally would tend to discount as self-serving," particularly when that evidence goes to an issue that is materially in dispute. *See Skipper*, 476 U.S. at 8. Here, the jury was offered only Caudill's own account—recounted more clinically, via Schilling's expert testimony—of the abuse that she suffered at the hands of violent male partners. Given that Caudill's case hinged in part on arguing that Goforth was principally responsible for the killing, *see, e.g., Caudill I*, 120 S.W.3d at 648, there is ample reason that a jury might have discredited Caudill's own reports of the viciousness of her former male companions. Evidence from those

former male companions—"who would have had no particular reason to be favorably predisposed toward" admitting their own guilt, *see Skipper*, 476 U.S. at 8—would have powerfully and distinctly corroborated Caudill's claims, as would the medical records themselves. Thus, there is no reason to deem those records cumulative.

The majority is right that we must "keep in mind the State's evidence on the other side of the scale," Maj. Op. at 12, but its weighing goes astray. First, that Caudill "dated White's son, and White gave Caudill money many times before," *id.*, cuts both ways: it would make just as much sense to assume that Goforth, a stranger with no sentimental connection to White, was the more likely culprit, especially given Caudill's lack of any violent history and Goforth's own appalling attempt to claim "that an unidentified African-American male had assisted Caudill in the commission of the crimes (an assertion he admitted at trial was a fabrication)," *Caudill I*, 120 S.W.3d at 650. Second, though three Commonwealth witnesses offered inculpatory hearsay testimony, Maj. Op. at 12, each of these witnesses had credibility issues that were litigated on appeal, *see, e.g.*, R. 34 (Dist. Ct. Op. & Order at 13–19, 36–48) (Page ID #444–50, 467–479), and none of these three witnesses provided undisputed testimony rendering Caudill's primary guilt a foregone conclusion.[8] Third, while the majority observes that "at least some jurors thought that Caudill was the aggressor rather than the dupe," Maj. Op. at 14, that fact is of limited relevance. The standard for prejudice is not whether the *whole* (or even a majority of the) jury would have decided to eschew a death sentence, but rather whether "at least *one* juror would have" done so. *Wiggins*, 539 U.S. at 537 (emphasis added).

While identifying two "theor[ies] for leniency" that Caudill's mitigation case "implicated"—Caudill's addiction and Caudill's childhood abuse, Maj. Op. at 8—the majority also misses a crucial, and complementary, third: residual doubt about guilt. As noted above, the

---

[8]As the majority's opinion suggests, the most damning of these witnesses was Julia Davis, who testified that Caudill had later mocked the dying victim. *See* R. 47-7 (Trial Tr., Videotape #6 at 254) (Page ID #1512). But Davis was one of two jailhouse informants—each of whose hearsay statements Caudill disputed from the witness stand, R. 47-8 (Trial Tr., Videotape #7 at 72–79) (Page ID #1638–45)—and Davis "acknowledged [to the jury] that she had received consideration in the form of a lesser sentence for her cooperation with the prosecution," R. 34 (Dist. Ct. Op. & Order at 19) (Page ID #450). Moreover, Caudill testified that Davis specifically had a vendetta against her. R. 47-8 (Trial Tr., Videotape #7 at 72–74, 123–24) (Page ID #1638–40, 1689–90). In short, what majority declares happened "[a]t bottom," Maj. Op. at 13, is in actuality a permissible conclusion to draw, but by no means the indisputable conclusion that the majority implies it to be.

jury never resolved whether Caudill or Goforth had taken the lead in perpetrating the killing: each had accused the other of serving as the principal during the trial, *Caudill I*, 120 S.W.3d at 648, but the jury simply convicted both of "murder—principal or accomplice," *id.* at 666. And whatever residual doubt the jury must have had about Caudill's primary guilt could not only logically coexist with compassion for her childhood abuse, *see Wiggins*, 539 U.S. at 535, but might also have been substantially bolstered by further evidence that Goforth was one more in a long line of violent, maybe even murderous men under whose sway Caudill had fallen.

It is not mere speculation that these two mutually reinforcing mitigation themes— residual doubt about guilt and limited culpability based on childhood trauma—would, if adequately developed, have yielded a reasonable probability of a different result. We know from empirical evidence that these two themes *do* tend to impact capital jurors' reasoning. *See* Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 COLUM. L. REV. 1538, 1561–66 (1998) (presenting data indicating that "'[r]esidual doubt' over the defendant's guilt is the most powerful 'mitigating' fact," *id.* at 1563, and that "[c]ircumstances over which the defendant had no control and that may have helped form (or misform) his character," such as childhood abuse, "ha[ve] a noticeable but limited mitigating effect," *id.* at 1565).

This potent combination also distinguishes the prejudice analysis in this case from that of a case like *Van Hook*. There, as the majority notes, Maj. Op. at 13, the Supreme Court ruled that there was no prejudice from counsel's failure to present testimony "that [Van Hook's] father hit Van Hook frequently and tried to kill Van Hook's mother," given that "the trial court . . . was already aware that his father had a violent nature, had attacked Van Hook's mother, and had beaten Van Hook at least once," *Van Hook*, 558 U.S. at 12. Counterbalancing these details (which were, for the reasons discussed above, more cumulative than what Caudill's counsel missed here) was Van Hook's undisputed and undivided guilt. *Id.* at 13. As the Court explained, "Van Hook's confession made clear, and he never subsequently denied, . . . that he was the sole perpetrator of the crime"; moreover, he "had previously pursued the same strategy—of luring homosexual men into secluded settings to rob them—many times since his teenage years, and he employed it again even after [the victim's] murder in the weeks before his arrest." *Id.*

Caudill's story is very different.  There was no crime even remotely like this one in her past, but there was an almost endless series of violent men who traumatized, abused, and controlled her.  Despite the hearsay evidence offered by the three questionable Commonwealth witnesses discussed above, Caudill herself maintained throughout that she was not the primary perpetrator.  (Unlike Goforth, Caudill also never sought to shift blame onto a completely innocent third party.  *See Caudill I*, 120 S.W.3d at 650.)  And indeed, the jury never did decide which of the two was primarily responsible.  *See Caudill I*, 120 S.W.3d at 666.  There is thus, as I read this case on de novo review, "a reasonable probability that at least one juror would have struck a different balance" if counsel had put on a constitutionally adequate mitigation case.  *See Wiggins*, 539 U.S. at 537.

* * *

The Supreme Court's Sixth Amendment right-to-counsel jurisprudence is premised on the basic notion that all persons must be guaranteed "a fair trial."  *Strickland*, 466 U.S. at 685.  That means a trial in which the "adversarial testing process works to produce a just result under the standards governing decision," including with regard to sentencing.  *Id.* at 687.  Modern constitutional regulation of capital sentencing, meanwhile, is premised in part on the guarantee of "particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death," *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (plurality opinion)—that all capital defendants will be treated "as uniquely individual human beings, [not] as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death," *id.* at 304.

Mitigation evidence is particularly important to the adversarial testing surrounding this individualized consideration "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."  *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)).  If capital punishment is to "be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution,'" *Roper v. Simmons*, 543 U.S. 551, 568 (2005) (quoting

*Atkins v. Virginia*, 536 U.S. 304, 319 (2002)), then capital juries must receive accurate and competent mitigation presentations from capital defense attorneys.

As deferential as we must be to all ineffective-assistance claims, *see Strickland*, 466 U.S. at 689, and especially to those on AEDPA review, *see Pinholster*, 563 U.S. at 190, I believe that Caudill's ineffective-assistance claim overcomes the high bars that it faces. The majority, applying the same standards, sees things differently. But leaving aside for a moment the formalities of our standards, I also wonder whether any reasonable person would, if they or an acquaintance were on trial for their life, accept as satisfactory the representation that Caudill received. Looking at the completely cursory (and at times self-defeating) testimony elicited from Caudill's close family members (evidently thrown on the stand with no preparation), the mitigation specialist's panicked pleas for help, and counsel's failure to discover (much less present) the readily available vivid accounts of the abuse that Caudill repeatedly suffered at the hands of violent and dominating men (which could have significantly furthered residual doubts about her primary guilt), I cannot imagine that the answer is yes. And so even if this is a close case, that signifies nothing especially good about the representation that Caudill received, and quite a bit about the paltriness of what binding precedent has understood the Sixth Amendment to demand.

But because I believe that Caudill's trial counsel fell unreasonably short of even the low constitutional standards at issue, and because I believe that this deficiency prejudiced her chances of avoiding a death sentence, I respectfully dissent.